UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| THOMAS KENNETH ABRAHAM<br>d/b/a PADDLE TRAMPS MFG. CO.,<br>Plaintiff,<br><br>v.<br><br><br>ALPHA CHI OMEGA ET AL.,<br>Defendants. | § § § § § § § § § § § § § | Case no. 3:08-cv-570-F |

## MEMORANDUM OPINION AND ORDER REGARDING DEFENDANTS' OBJECTION TO THE COURT'S CHARGE TO THE JURY AS TO LACHES

This is a trademark case. Plaintiff (Thomas Kenneth Abraham "Mr. Abraham") sued Defendants (jointly referred to as the "Greek Organizations") for declaratory and injunctive relief. The Greek Organizations countered with infringement claims. Mr. Abraham raised the defenses of laches and acquiescence and the Greek Organizations countered with the defense of unclean hands. This Court granted summary judgment on the Greek Organizations' infringement claims and then submitted the case to the jury on laches, acquiescence and unclean hands.

The Greek Organizations timely objected to several of the Court's instructions to the jury, including the instruction as to when the delay period ends on the laches defense. The Court instructed the jury that the unexcused delay period ends when the trademark owner files suit. The Greek Organizations objected, asserting that the unexcused delay period ends when the trademark owner notifies the unlicensed user of its objection to the

1

use.

The purpose of this Memorandum Opinion and Order is to explain why the Court overruled the objection of the Greek Organizations to the laches instruction and why the Court instead set the end period for delay at the time suit was filed, based on the particular facts of this case.

**Factual and Procedural Background**

As noted above, this is a trademark case involving Mr. Abraham's unlicensed use and sale of the Greek Organizations' insignia through his business Paddle Tramps. In 1961, Mr. Abraham founded Paddle Tramps for the purpose of creating and selling materials needed to construct decorative paddles that new fraternity and sorority members traditionally present to their "big brothers" or "big sisters" during the initiation process. At first the company assembled custom wooden paddles to the specifications of its customers from a shop in Lubbock, Texas. In the late 1960s, Paddle Tramps began wholesaling its products to stores and retail outlets throughout the country and participating in national trade shows. By 1990, Paddle Tramps had evolved into a national business with accounts in all 50 states and the District of Columbia.

Mr. Abraham set up a website for Paddle Tramps in 1997. Initially, the website merely displayed the company's products. Later the site was modified to allow visitors to conduct a zip code search to locate area retailers of Paddle Tramps's products. By 2001, the site was configured to allow customers to purchase products, including preassembled custom paddles and "paddle kits," which contain the component parts of

2

the paddle to be assembled by the customer.

After the first few decades of Paddle Tramps's existence, certain individual Greek Organizations contacted Mr. Abraham about entering into licensing programs for the use of their marks. These communications frequently led to compromise or resolution without litigation. Starting in 1990, the Greek Organizations began to increase their vigilance in policing their marks by sending cease and desist letters to Mr. Abraham. In those letters, they informed Paddle Tramps of their licensing programs and invited the company to join these programs or cease and desist its use of the marks. Finally, in 2007, the Greek Organizations filed suit against Mr. Abraham to enforce their trademarks. That case was dismissed and this case followed.

As noted above, in a previous Order, the Court granted the Greek Organizations' Motion for Summary Judgment as to their claims, determining that Mr. Abraham's sale of the Greek Organizations' insignia amounts to trademark infringement and unfair competition under federal law and trademark dilution under Texas state law (Doc. No. 75). The issues left for the jury to resolve involved Mr. Abraham's contention that the Greek Organizations' claims are barred by the defenses of laches and acquiescence, and the Greek Organizations' response that Mr. Abraham is precluded from raising equitable defenses because he has "unclean hands."

The Jury Charge described the undue prejudice element of Mr. Abraham's laches defense as follows:

> Mr. Abraham must prove by a preponderance of the evidence that he was unduly prejudiced by the Greek Organizations' delay.
> An unlicensed user is unduly prejudiced when, *in reliance on the*

3

> *trademark owner's unexcused delay in filing suit*, he or she makes major business investments or expansions that depend on the use of the marks; these investments and expansions would suffer appreciable loss if the marks were enforced; and this loss would not have been incurred had the trademark owner enforced his rights earlier. The amount of prejudice suffered by the unlicensed user in a given case may vary with the length of the delay; that is, the longer the period of delay, the more likely it is that undue prejudice has occurred. The period of delay begins when the trademark owner knew or should have known of the unlicensed user's use of the marks and *ends when the trademark owner files suit against the unlicensed user*. Therefore, to determine whether Mr. Abraham has been unduly prejudiced by the Greek Organizations' delay, you must consider what business investments and expansions Mr. Abraham made between the time the Greek Organizations knew or should have known of his use of their marks and *the time they filed suit against him*.

Court's Charge to the Jury 4–5, Sept. 27, 2011 (Doc. No. 119) (emphasis added). The Court held a Charge Conference to address both parties' objections to the Jury Charge on September 26, 2011. Counsel for the Greek Organizations argued the relevant period of delay for the laches defense ends not when suit is filed, but when the mark owner notifies the unlicensed user of his or her objection to the use. Counsel for Mr. Abraham countered that the Jury Charge states the law on this point correctly. The Court overruled the Greek Organizations' objection from the bench, and instructed the jury that the period of delay ended when the Greek Organizations filed suit against Mr. Abraham. As noted above, this Opinion and Order will review the current state of the law with respect to the period of delay and the facts of this particular case in order to explain the Court's decision on the laches instruction.

## The Law

"Laches is commonly defined as an inexcusable delay that results in prejudice to

the defendant." *Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 668 (5th Cir. 2000) (quoting *Conan Prop., Inc. v. Conans Pizza, Inc.*, 752 F.2d 145, 153 (5th Cir. 1985)). The party asserting the laches defense must prove 1) delay in asserting a claim; 2) lack of excuse for the delay; and 3) undue prejudice to the alleged infringer caused by the delay. *Id.* (citing *Elvis Presley Enter. v. Capece*, 141 F.3d 188, 205 (5th Cir. 1998)).

The longer the period of delay, the more likely the allegedly infringing user has suffered undue prejudice. *See Armco, Inc. v. Armco Burglar Alarm Co., Inc.*, 693 F.2d 1155, 1161 (5th Cir. 1982) ("Given the[] elements [of laches] it is plain that the time spectrum for their application is critical.") Therefore, the parameters imposed on the period of delay significantly impact the undue prejudice analysis. The period of delay begins when the mark owner knew or should have known of the infringing use. *Id.* at 1161–62. The point at which the period of delay ends depends upon the nature of the allegedly infringing use. Where an unlicensed user assumes additional investment risks that result in new use of the mark after the mark owner demands that the unlicensed user cease and desist, the relevant period of delay for the undue prejudice analysis of the laches defense is cut off upon receipt of the mark owner's demands. *See Conan*, 752 F.2d at 151-52 (terminating the period of delay at notice of the plaintiff's objection when the defendant opened a new restaurant with the same infringing name in a different part of town after receiving cease and desist letters from the plaintiff); *Elvis Presley*, 141 F.3d at 205 (finding the period of delay cut off by the plaintiff's cease and desist demand where the defendant opened up a new night club bearing the infringing name after he received the plaintiff's demands); *Westchester*, 214 F.3d at 668 (concluding the period of

delay ended upon issuance of the cease and desist demand where the defendant created a new magazine after receiving notice of the plaintiff's objection to the use). However, where the unlicensed user's use of the mark continues largely as it did before the mark owner's objection, the relevant period of delay for the undue prejudice analysis of the laches defense ends when the mark owner files suit against the unlicensed user. *See H.G. Shopping Centers, L.P. v. Birney*, No. H-99-0622, 2000 WL 33538621 (S.D. Tex. Nov. 29, 2000) (Johnson, J.) (finding the plaintiff's demands that the infringing use cease and desist did not cut off the period of delay where the business with the infringing name remained at one location and provided the same services that it did before receiving notice of the plaintiff's objection).

A pizza parlor in *Conan* and a night club in *Elvis Presley* used names that infringed the trademark rights of others. *Conan*, 752 F.2d at 147; *Elvis Presley*, 141 F.3d at 191. In both cases, the defendants opened new facilities bearing the infringing names in new locations after receiving the mark owner's cease and desist letters. *Conan*, 752 F.2d at 151–52; *Elvis Presley*, 141 F.3d at 205. In both instances, the Fifth Circuit found that the relevant period of delay for purposes of the laches defense ran from when the plaintiff knew or should have known of the infringing use to the plaintiff's demands that the defendant cease and desist. *Conan*, 752 F.2d at 151–52; *Elvis Presley*, 141 F.3d at 205. The *Conan* court put it succinctly: "Conans received CPI's cease and desist letter prior to opening the San Antonio restaurant. . . . [and] therefore opened that restaurant at its own peril, without the defenses of laches and acquiescence." *Conan*, 752 F.2d at 151-52. The *Elvis Presley* court found infringing activities initiated after receipt of plaintiff's

cease and desist letter were "not relevant to the laches period." *Elvis Presley*, 141 F.3d at 205. Similarly, in *Westchester Media*, the court found the defendant could not avail himself of the laches defense where he created an entirely new infringing version of *POLO* magazine after being notified of the plaintiff's objection to the magazine's title. *Westchester Media*, 214 F.3d at 668.

However, in *H.G. Shopping Centers, L.P. v. Birney*, the Southern District of Texas found the period of delay did not end until the mark owner filed suit, even though the owner had sent the defendant at least seven cease and desist demands over a period of almost twenty years. *Birney*, 2000 WL 33538621, at *1–2, *5. The plaintiff in *Birney* sought to enforce his trademark rights to the name "The Galleria," a popular Houston commercial development, against nearby condominiums called the "Galleria Oaks." *Id.* at *1. Shortly after the Galleria Oaks opened in 1978, the mark owner sent a letter objecting to the residential development's use of the "Galleria" name. *Id.* This was the first in a series of letters that the plaintiff sent to the Galleria Oaks protesting the use of the name over the next twenty years. *Id.* at *1–2. When the plaintiff finally filed suit against Galleria Oaks in 1999, the defendant asserted a laches defense. *Id.* at *4. Citing *Conan*, *Elvis Presley*, and *Westchester*, the plaintiff argued that the laches defense was not available to the defendant because he was on notice of the plaintiff's objections to the name Galleria Oaks. *Id.* at *9. The court found the facts of *Birney* distinguishable from those cases, explaining:

> [t]he cases cited by Plaintiff do not support the proposition that a cease and desist letter voids, as a matter of law, a laches defense. In all three of the cases cited by Plaintiff, the defendants assumed, after

7

receiving cease and desist letters, additional investment risks which resulted in the expanded use of the challenged mark.

*Id.* The court found no reason to deprive the defendant of the laches defense in spite of the plaintiff's demands that the defendant cease and desist, because, unlike the new business ventures initiated by the defendants after receipt of the plaintiffs' objections in *Conans*, *Elvis Presley*, and *Westchester*, the Galleria Oaks Condominiums had remained at the same location and provided its customers similar services throughout its existence. *Id.* The court was not sympathetic to the plaintiff's argument that its claim against the defendant did not become ripe until the Galleria Oaks Condominiums went through a major renovation that transformed them from "slum dwellings" to "higher end" residences. *Id.* at *8. The court further emphasized the fact that in all three cases relied on by the plaintiff, the mark owner filed suit against the infringing user within a couple of years after sending cease and desist letters. *Id.* at *9. By contrast, the owner of the "Galleria" name waited nearly twenty years to file suit after making its first cease and desist demand. *Id.*

### This Case

In the case before the Court, the point at which the period of delay began has not been strongly contested. The parties have stipulated to when the various Greek Organizations had actual knowledge of Mr. Abraham's use of their marks, and the jury has answered if and when the Greek Organizations should have known of his use. The parties do differ, however, over the proper end point of the period of delay. The Greek Organizations argue the period of delay for purposes of Mr. Abraham's laches defense

8

should be cut off upon his receipt of the Greek Organizations' letters objecting to his use of their insignia. Mr. Abraham contends the period should end when the Greek Organizations filed suit against him. On this point, the Court is of the opinion that the facts of this case align more closely with *Birney* than with *Conans*, *Elvis Presley*, and *Westchester*. The end of the period of delay, therefore, is when the Greek Organizations' filed suit.

Like the defendant in *Birney*, Mr. Abraham received cease and desist letters from the Greek Organizations for a prolonged period of time beginning in the 1990s. Mr. Abraham's business had already met great success by that time; in fact, by 1990, Mr. Abraham had accounts in all fifty states and the District of Columbia. The Greek Organizations point to the fact that Mr. Abraham developed a website and started conducting online sales between 1997 and 2001 while on notice of the Greek Organizations' objections to his use of their marks. However, this change in Paddle Tramps's operations hardly amounts to constructing an entirely new branch of the infringing operation as in the *Conan*, *Elvis Presley*, and *Westchester* cases. The creation and use of a website to promote Mr. Abraham's existing business is certainly a less drastic development than the renovations the Galleria Oaks Condominiums underwent in the *Birney* case, where the court found that the period of delay did not end with notice of the plaintiff's objection because the infringing operation remained at one location and provided the same services that it had before the plaintiff demanded that the infringing use cease and desist. *Birney*, 2000 WL 33538621, at *9. Further, between the time of cease and desist letters, beginning in 1990, and suit, filed in 2007, the Greek

9

Organizations delayed not a few years, as in *Conans*, *Elvis Presley*, and *Westchester*, but almost twenty years as in *Birney*. *Id*.

Accordingly, the Court finds that Mr. Abraham did not establish Paddle Tramps's website "at his own risk without the benefit of the laches defense," and that the period of delay should not be cut off upon Mr. Abraham's receipt of the Greek Organizations' cease and desist demands. Therefore, the proper measure of the period of delay is from the time the Greek Organizations should have known of Mr. Abraham's infringing use as determined by the jury, to the time they filed suit against him.

While the Court acknowledges that the determination of when the period of delay ends for purposes of the laches defense is closely tied to the excuse element of laches, particularly the doctrine of progressive encroachment, this Opinion concerns only the jury instruction associated with the length of the period of delay to which the Greek Organizations object. The doctrine of progressive encroachment excuses the mark owner's delay in the filing of a suit "where a defendant begins use of a trademark or trade dress in the market, and then directs its marketing or manufacturing efforts such that it is it is placed more squarely in competition with the plaintiff." *Kason Indus. v. Component Hardware Group, Inc.*, 120 F.3d 1199, 1205 (11th Cir. 1997). Analysis of the extent to which the infringing user's use of the marks expanded or changed after the initial infringing use is critical to determining both the end of the period of delay and whether the mark owner's delay was excused as a result of progressive encroachment. However, this Court's conclusions with respect to the proper measure of the period of delay in this case do not amount to a finding that the Greek Organizations could not be excused based

10

on the doctrine of progressive encroachment. While both analyses consider the timing of changes made to the infringing operation, the question of when the period of delay should end turns on what changes occurred after the mark owner demanded that the unlicensed use end, while the progressive encroachment question examines change in the infringing use of the marks with a wider lens. *Compare Conan*, 752 F.2d at 151-52 (considering the end of the period of delay in terms of the defendant's activities after receipt of the plaintiff's demands that the infringing use cease and desist), *with Kason*, 120 F.3d at 1206 (analyzing progressive encroachment in terms of the entire length of the infringing activity). To determine whether the Greek Organizations' delay was excused under the doctrine of progressive encroachment, the jury is not limited to the period following Mr. Abraham's receipt of the cease and desist letters, but can instead consider all changes and expansions of his use of their marks since Paddle Tramps was founded. Indeed, the Greek Organizations' argument with respect to progressive encroachment points not only to the development of the Paddle Tramps website, but also to the expansion and success Mr. Abraham experienced from his humble beginnings in Lubbock, Texas. Progressive encroachment was explained this way in the Jury Charge, and the question of whether the Greek Organizations' delay was excused was submitted to and resolved by the jury. As such, the Court need not, nor does it intend to decide that issue.

## Conclusion

For the reasons stated above, it is the opinion of the Court that the length of the Greek Organizations' delay for purposes of Mr. Abraham's laches defense should be

11

measured from the time the Greek Organizations knew or should have known of Mr. Abraham's use of their marks until the time they filed suit against him. The Jury Charge so instructs. Therefore, the Greek Organizations' objection to the Charge with respect to the length of the relevant period of delay is OVERRULED.

    IT IS SO ORDERED.

    SIGNED this 5th day of October, 2011.

    _____
    Royal Furgeson
    Senior United States District Judge