U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

MAY - 7 2012

CLERK, U.S. DISTRICT COURT
By _____ M. T.
          Deputy    8:30a.m.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

THOMAS KENNETH ABRAHAM                §
d/b/a PADDLE TRAMPS MFG. CO.,          §        Case no. 3:08-cv-570-F
        Plaintiff,                     §
                                       §
v.                                     §
                                       §
ALPHA CHI OMEGA ET AL.,                §
        Defendants.                    §
                                       §

ORDER GRANTING PLAINTIFF'S
MOTION FOR JUDGMENT ON THE VERDICT;
DENYING DEFENDANTS' MOTION FOR JUDGMENT
AS A MATTER OF LAW; AND GRANTING IN PART AND DENYING IN
PART DEFENDANTS' MOTION FOR ENTRY OF PERMANENT INJUNCTION

BEFORE THE COURT is Plaintiff, Thomas Kenneth Abraham's d/b/a Paddle

Tramps Manufacturing Company ("Abraham" or "Paddle Tramps") Motion for Judgment

(Doc. No. 130), filed on October 14, 2011, and Defendants', 32 fraternity and sorority

organizations (collectively, "the Greeks" or "the Greek Organizations") Cross-Motion for

Judgment as a Matter of Law and For Entry of Permanent Injunction filed on November

8, 2011 (Doc. No. 136).  Abraham filed a Response and Reply on November 23, 2011

(Doc. No. 147), and the Greek Organizations filed a Reply on December 12, 2011 (Doc.

No. 148).  The Court held a hearing on these matters on April 2, 2012.  After the hearing,

the parties were granted leave to file supplemental briefing regarding the potential impact

of a permanent injunction on Abraham's business.  Abraham filed his Supplemental Brief

on April 11, 2012 (Doc. No. 151), and the Greek Organizations filed their Supplemental

Brief on April 18, 2012 (Doc. No. 153).  Abraham filed a Reply on April 23, 2012 (Doc.

No. 157) and the Greek Organizations filed a Sur-Reply on April 27, 2012 (Doc.

1

157).  After considering the parties' briefs and arguments and reviewing the evidence, the

Court is of the opinion that Plaintiff's Motion for Judgment should be GRANTED,

Defendants' Cross-Motion for Judgment as a Matter of Law should be DENIED, and

Defendants' Motion for Entry of Permanent Injunction should be GRANTED IN PART

and DENIED IN PART.[1]

## I.      Factual and Procedural Background

This is an exceptional trademark case in which Abraham used and sold the Greek

Organizations' insignia through his business Paddle Tramps for 40 years before the

Greek Organizations filed suit to enforce their marks.  While the Greek Organizations

raise a number of issues concerning the jury instructions, the central question before the

Court is whether a 40-year laches period forecloses the remedy of permanent prospective

injunctive relief.

In 1961, Abraham founded Paddle Tramps for the purpose of creating and selling

materials needed to construct decorative paddles that new fraternity and sorority

members traditionally present to their "big brothers" or "big sisters" during their

initiation into the various organizations.  At first the company assembled custom wooden

paddles to the specifications of its customers from a shop in Lubbock, Texas.  In the late

1960s, Paddle Tramps began wholesaling its products to stores and retail outlets

throughout the country and participating in national trade shows.  By 1990, Paddle

Tramps had evolved into a national business with accounts in all 50 states and the District

of Columbia.

---

[1] This resolves Doc. Nos. 130, 136.

Abraham set up a website for Paddle Tramps in 1997. Initially, the website merely displayed the company's products. Later the site was modified to allow visitors to conduct a zip code search to locate area retailers of Paddle Tramps's products. By 2001, the site was configured to allow customers to purchase products, including preassembled custom paddles and "paddle kits," which contain the component parts of the paddle to be assembled by the customer.

After the first few decades of Paddle Tramps's existence, certain individual Greek Organizations contacted Abraham about entering into licensing programs for the use of their marks. These communications frequently led to compromise or resolution without litigation. Starting in 1990, the Greek Organizations began to increase their vigilance in policing their marks by sending cease and desist letters to Abraham. In those letters, they informed Paddle Tramps of their licensing programs and invited the company to join these programs or stop using the marks. Finally, in 2007, the Greek Organizations filed suit against Abraham to enforce their trademarks in Florida. That case was dismissed for improper venue, and this case, in which Abraham sued the Greek Organizations for declaratory judgment of noninfringement, followed.

On April 26, 2011, the Court granted summary judgment in favor of the Greek Organizations, determining that Abraham's sale of the Greek Organizations' insignia amounts to trademark infringement and unfair competition under federal law, and trademark dilution under Texas state law (Doc. No. 75). Abraham's defenses of laches and acquiescence and the Greek Organizations' counter-defense of unclean hands went to the jury.

After a trial on the merits, the jury found the following:

> (1) the Greek Organizations lacked an excuse for their delay in filing suit against Abraham;

> (2) the earliest date when any of the Greek Organizations should have known that Abraham was using their marks was 1968;

> (3) Abraham would suffer undue economic prejudice if the Greek Organizations were now permitted to enforce their rights;

> (4) authorized officials of the Greek Organizations implicitly assured Abraham that it was acceptable for him to continue using their marks before sending him notice of their objections;

> (5) Abraham relied on these assurances;

> (6) Abraham would suffer undue economic prejudice if the Greek Organizations were now permitted to enforce their rights; and

> (7) the Greek Organizations failed to prove by a preponderance of the evidence that Abraham had unclean hands in connection with his use of the marks.

In the instant Motions, Abraham moves the Court to declare that the counterclaims of the Greek Organizations are barred by laches and/or acquiescence and the Greek Organizations are not entitled to damages or injunctive relief, and to award costs of court to Abraham. The Greek Organizations move the Court to enter judgment as a matter of law against Abraham on his laches and acquiescence defenses, or in favor of the Greek Organizations on the issue of progressive encroachment and/or unclean hands, and to enter an injunction permanently enjoining Abraham from using the Greeks' marks.

## II.  Discussion

The Court first considers the parties' Motions for Judgment on the Verdict and Judgment as a Matter of Law, then turns to Defendants' Motion for Entry of a Permanent

Injunction, and finally decides the appropriate allocation of costs of court.

### A.   Abraham's Motion for Judgment on the Verdict and the Greek Organizations' Motion for Judgment as a Matter of Law

Abraham moves for judgment on the verdict pursuant to Fed. R. Civ. P. 58. The Greek Organizations move for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a)(1). As an initial matter, the Court notes that the Greek Organizations have styled their post-trial motion as a renewed Rule 50 motion for judgment as a matter of law, which is properly designated a Rule 50(b) motion after the matter has been submitted to the jury. A motion for judgment as a matter of law under Rule 50(b) in an action tried by a jury is a challenge to the legal sufficiency of the evidence supporting the verdict. *Hiltgen v. Sumrall*, 47 F.3d 695, 699 (5th Cir. 1995). However, the Greeks' post-trial motion does not challenge the sufficiency of the evidence at all; it merely reiterates their objections to the instructions as argued at the charge conference, and contends that had the jury been "properly instructed," the evidence would not be legally sufficient to support its verdict. Therefore, the Court reviews the sufficiency of the evidence in the context of the instructions that were actually given to the jury, and considers the Greek Organizations' arguments with respect to the charge for the limited purpose of clarifying the Court's rulings at the charge conference.

#### 1. Legal Standard

##### a. Rule 50(b)

In ruling on a renewed motion for judgment as a matter of law, a court may: "(1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3)

direct the entry of judgment as a matter of law." Fed. R. Civ. P. 50 (b)(1)–(3).  Judgment

as a matter of law is appropriate "when a party has been fully heard on an issue and there

is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that

issue."  *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 218–19 (5th Cir. 2001) (quoting

Fed. R. Civ. P. 50(a)).  There is no legally sufficient evidentiary basis when "the facts

and inferences point so strongly and overwhelmingly in favor of one party that the Court

believes that reasonable men could not arrive at a contrary verdict."  *Rubinstein v. Adm'rs*

*of the Tulane Educ. Fund*, 218 F.3d 392, 401 (5th Cir. 2000).  Thus, a trial court may

decide the case as a matter of law, notwithstanding the jury's verdict "when the facts are

sufficiently clear that the law requires a particular result."  *Weisgram v. Marley Co.*, 528

U.S. 440, 448 (2000) (quoting 9A CHARLES ALAN WRIGHT & ARTHUR R.

MILLER, FEDERAL PRACTICE AND PROCEDURE § 2521, at 240 (2d ed. 1995)).

Before doing so, however, "the court must draw all reasonable inferences in favor of the

nonmoving party."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150

(2000).

### *b. Objections to the Jury Charge*

As previously noted, in their post-trial motion the Greek Organizations reiterate

their objections to the jury charge, but do not move for a new trial.  Because a party

challenging the jury instructions would typically seek a new trial in the court that issued

them before pursuing the matter on appeal, the Court reviews its instructions in light of

the standard applied to such a motion.  When moving for a new trial based on an

improper jury instruction, the Fifth Circuit advises:

First, the challenger must demonstrate that the charge creates substantial doubt as to whether the jury was properly guided in its deliberations. Second, even if the jury instructions were erroneous, we will not reverse if we determine based on the entire record, that the challenged instruction could not have affected the outcome of the case.

*Green v. Admin. of Tulane Ed. Fund*, 284 F.3d 642, 659 (5th Cir. 2002).

2. Application

a. *Unclean Hands*

The Greek Organizations argue that they are entitled to judgment as a matter of law because "[n]o properly instructed jury would have a legally sufficient evidentiary basis to find that Abraham did not have clean hands." Defs.' Mot, at 12.  The jury was instructed as follows:

> To prevail on their claim that Mr. Abraham may not assert the laches or acquiescence defenses because he has unclean hands, the Greek Organizations must prove by a preponderance of the evidence that Mr. Abraham knowingly intended to use the Greek Organizations' marks for the purpose of deriving benefit from the Greek Organizations' goodwill.
> Unclean hands may be found only where the unlicensed user "subjectively and knowingly" intended to confuse buyers.  Mere awareness of a trademark owner's claim to the same mark does not amount to having unclean hands nor establishes the bad intent necessary to preclude laches and acquiescence defenses.  The owner of the mark must demonstrate that at the time the unlicensed user began using the marks or sometime thereafter, he knowingly and intentionally infringed the marks with the bad faith intent to benefit from or capitalize on the mark owner's goodwill.
> Therefore, to determine whether Mr. Abraham has unclean hands, you must consider whether he knowingly intended to pass the marks off as being endorsed by the Greek Organizations for the purpose of profiting off their reputation.

Ct.'s Charge to the Jury, at 6–7 (Doc. No. 199).  The Greek Organizations contend that the jury should have been instructed that an unlicensed user of the marks has unclean hands if the user "duplicated the protected trademarks and sold them to the public

knowing that the public would identify them as being the [owner's] trademarks." Defs.'
Mot. for Judgment as a Matter of Law, at 11 (quoting *Boston Prof. Hockey Assoc. v.
Dallas Cap & Emblem Mfg., Inc.*, 510 F.2d 1004, 1012 (5th Cir. 1975)).  They also argue
that the jury should have been informed that unclean hands are presumed if Abraham
"intended to derive benefit from or capitalize on the marks." *Id.* at 12 (quoting *Conan
Prop., Inc. v. Conans Pizza, Inc.*, 752 F.2d 145 at 151 n.2).  The Greeks are of the
opinion that had the jury been so instructed, there would be no legally sufficient
evidentiary basis for the jury's finding that Abraham did not have unclean hands because
Abraham admitted that Paddle Tramps "intentionally uses the marks of the Greek
Organizations, knowing the Greek members will identify the marks with their respective
fraternity or sorority with the intention to capitalize off of the member affinity for the
marks." Defs.' Mot., at 11.

The Court rejected the Greek Organizations' proposed instructions at the charge
conference because they derive in part from *Boston Professional Hockey Association v.
Dallas Cap & Emblem Manufacturing, Inc.*, which is not an unclean hands case.  In
*Boston Professional*, the court considered the appropriate standard for likelihood to
confuse, not the test for unclean hands.  *Boston Prof. Hockey*, 510 F.2d at 1012
(explaining "[t]he confusion or deceit requirement [of a cause of action for mark
infringement] is met by the fact that the defendant duplicated the protected trademarks
and sold them to the public knowing that the public would identify them as being the
teams' trademarks").  Further, the Greeks' proposed instructions neglect to explain that
the mark user must have "bad faith," a requirement of unclean hands that is well-

8

established in the Fifth Circuit. *See Bd. Of Supervisors, et al v. Smack Apparel Co.*, 550 F.3d 465, 490 (5th Cir. 2008) ("The record here establishes the substantive and knowing bad faith necessary to foreclose an equitable defense."). The Court adopted language directly from the Fifth Circuit's opinion in *Conan Properties, Inc. v. Conans Pizza, Inc.* describing the test for unclean hands as whether the defendant employed the marks "with the explicit bad faith intent of 'passing off' its service and product as emanating from or endorsed by [Plaintiff]":

> This court has recognized that a defendant's mere awareness of a plaintiff's claim to the same mark neither amounts to passing off nor establishes the bad intent necessary to preclude the availability of the laches defense. . . To foreclose the laches and acquiescence defenses, the plaintiff must offer something more than mere objective evidence to demonstrate that the defendant employed the allegedly infringing mark with the wrongful intent of capitalizing on its goodwill.

*Conan Props*, 752 F.2d 145, 150 (5th Cir. 1985). In *Board of Supervisors for Louisiana State University Agricultural and Mechanical College v. Smack Apparel Co.*, in which the unlicensed user marketed soft goods bearing the University's marks, the Fifth Circuit confirmed that the subjective bad faith requirement from *Conan Props* extends to trademark cases involving affinity merchandise: "A defendant who intentionally infringes a trademark with the *bad faith intent* to capitalize on the markholder's good will lacks the clean hands necessary to assert the equitable defense [of laches]." 550 F.3d 465, 490 (5th Cir. 2008) (citing *Conan Props.*, 752 F.2d at 151 n.2). The Greek Organizations emphasize that in *Smack Apparel*, the Fifth Circuit affirmed the District Court's finding that Smack had the requisite bad faith to foreclose the laches defense because it admitted that "it intentionally copied the plaintiffs' color schemes." *Id.* However, this language

9

does not vitiate the bad faith requirement as the Greek Organizations would have the Court do. The jury was instructed consistently with *Smack Apparel*; that is, the jury was told that Abraham has unclean hands if he "knowingly and intentionally infringed the marks with the bad faith intent to benefit from or capitalize on the mark owner's goodwill," and that they must consider whether Abraham "knowingly intended to pass the marks off as being endorsed by the Greek Organizations for the purpose of profiting off their reputation." Accordingly, the Court finds that even had the Greek Organizations properly challenged the jury instructions on unclean hands, they would not have met their burden of demonstrating that, as a whole, the instructions create "substantial doubt as to whether the jury was properly guided in its deliberations." *Green*, 284 F.3d at 659.

The question now before the Court is whether there was a legally sufficient evidentiary basis for a reasonable jury to find that Abraham did not have unclean hands as instructed. The Court concludes that there was. Abraham testified that he started and operated his business for the purpose of filling a niche in the market and with the intent to service members of Greek Organizations with high-quality products sporting the organizations' insignia:

> Q. That's a great business idea. Let's make them for them. Is that kind of the genesis of your company?
>
> A. My idea was that I could come up with a much better way of making that and make a much higher quality product to deliver to the market so people would be proud of and keep for years, and I have done that. And established that all over the United States.
>
> . . .
>
> Q: And the idea for your business was to capitalize on that custom,

10

correct?

A: My thought was that I could make a much better product than was out there and make a living doing it. Had some good creative ideas and felt like I could service the market a lot better, and yes, sir, I did.

Trial Tr. vol. 2, 318–19, Sept. 20, 2011. This evidence contradicts the Greek Organizations' contention that there was no legally sufficient evidentiary basis for a reasonable jury to find that Abraham did not have unclean hands. The Court is satisfied that the facts and inferences do not point "so strongly and overwhelmingly in favor of" the Greek Organizations that a reasonable jury could not arrive at a contrary verdict. Accordingly, the Court DENIES the Greek Organizations' renewed motion for judgment as a matter of law and GRANTS Abraham's Motion for Judgment on the Verdict with respect to the Greek Organizations' counter-defense of unclean hands.

### b. *Undue Prejudice*

Next, the Greek Organizations argue that there is no legally sufficient evidentiary basis for the jury's finding that the delay in bringing this lawsuit unduly prejudiced Abraham. Once again, the Greek Organizations' arguments turn on the jury charge. The jury was instructed on undue prejudice as follows:

Mr. Abraham must prove by a preponderance of the evidence that he was unduly prejudiced by the Greek Organizations' delay.

An unlicensed user is unduly prejudiced when, in reliance on the trademark owner's unexcused delay in filing suit, he or she makes major business investments or expansions that depend on the use of the marks; these investments and expansions would suffer appreciable loss if the marks were enforced; and this loss would not have been incurred had the trademark owner enforced his rights earlier. The amount of prejudice suffered by the unlicensed user in a given case may vary with the length of the delay; that is, the longer the period of delay, the more likely it is that

undue prejudice has occurred.   The period of delay begins when the trademark owner knew or should have known of the unlicensed user's use of the marks and ends when the trademark owner files suit against the unlicensed user.   Therefore, to determine whether Mr. Abraham has been unduly prejudiced by the Greek Organizations' delay, you must consider what business investments and expansions Mr. Abraham made between the time the Greek Organizations knew or should have known of his use of their marks and the time they filed suit against him.

Ct.'s Charge to the Jury, at 4–5.   The Greeks contend that the jury should have been instructed that the appropriate measure of undue prejudice is whether enjoining the use would "destroy[] the investment of capital."   Defs.' Mot., at 13 (quoting *Elvis Presley Enters. v. Capece*, 141 F.3d 188, 206 (5th Cir. 1998)).   The Greeks argue that the Court's instructions improperly focused the jury's attention on what investments were made as opposed to whether those investments would be destroyed if Abraham was enjoined from using their marks.   According to the Greeks, had the jury been "properly" instructed, there would be no legally sufficient evidentiary basis for its findings because Abraham's infringing use of the Greeks' marks constitutes only 2.44% of Paddle Tramps's income, and the equipment in which Abraham invested is used to make non-infringing products, such that if the infringing use was enjoined, Abraham's investment of capital would not be destroyed.

The Court heard and rejected these same arguments during the charge conference. Fifth Circuit cases have consistently described "undue prejudice" in terms of investments the defendant made in reliance on the plaintiff's delay.   For example, in *Conans Properties*, the Fifth Circuit specifically defined prejudice as follows: "the defendant has done something it otherwise would not have done absent the plaintiff's conduct."

*Conans Prop.*, 752 F.2d, at 153. In *H.G. Shopping Centers, L.P. v. Birney*, the court explained "[l]aches applies, therefore, if Defendants can show that they were prejudiced by the delay or changed their position to their detriment because of the delay." No. H-99-0622, 2000 WL 33538621, at *9 (S.D. Tex. Nov. 29, 2000) (Johnson, J.).

At the hearing on their post-judgment motions, the Greeks placed great emphasis on the Eight Circuit's finding in *Champagne Louis Roederer v. J. Garcia Carrion* that no undue prejudice could be found where the infringing activity constituted only 9% of the infringer's business. *Champagne Louis Roederer v. J. Garcia Carrion*, 569 F.3d 855, 861 (8th Cir. 2009). However, the Court's instruction is not inconsistent with *Champagne*; there the court merely focused its undue prejudice analysis on the extent to which the infringer's investment during the period of the mark owner's delay was motivated by the infringing activity: "When a defendant has invested generally in an industry, and not a particular product, the likelihood of prejudicial reliance decreases in proportion to the particular product's role in the business." *Id.* Therefore, the Court finds that even had the Greek Organizations properly challenged the jury instructions on undue prejudice, they would not have met their burden of demonstrating that, as a whole, the instructions create "substantial doubt as to whether the jury was properly guided in its deliberations." *Green*, 284 F.3d at 659.

The question now before the Court is whether there was a legally sufficient evidentiary basis for a reasonable jury to find that Abraham suffered undue prejudice as instructed. The Court finds that there was. Even though the infringing use constitutes only 2.44% of Paddle Tramps's income, the jury heard testimony that Paddle Tramps's

sales of its signature double-raised crest drives the sales of its other products, that Abraham would not have invested in equipment and factory space had the Greek Organizations objected to his use of their marks earlier, and if his use of the marks was enjoined, the value of Abraham's investments would be lost.

The Greeks once again direct the Court's attention to the Eighth Circuit's finding in *Champagne* that no undue prejudice could be found where as much as 9% of the defendant's business could be attributed to the infringing activity, and emphasize that here, sales of infringing products account for only 2.44% of Paddle Tramps's business. However, *Champagne* is easily distinguished from the facts at bar. In *Champagne*, the mark-owner delayed only eleven years before filing suit. *Champagne*, 569 F.3d at 858. Here, it is undisputed that the Greek Organizations waited forty years before taking legal action against Abraham. Further, in *Champagne*, the court focused on the portion of the business that was attributable to the sale of infringing products at the time the investments were made—not at the time the plaintiff filed suit: "The Cristalino brand accounted for approximately 9% of Jaume Serra's output *after the improvements were completed in 2003*." *Id.* at 861 (emphasis added). The Greek Organizations place great weight on the fact that the infringing products account for only 2.44% of Paddle Tramps's business today, however, through Paddle Tramps, Abraham created the market for the infringing products and invested in the development of those products throughout the life of his business. When Paddle Tramps started out, wood carved Greek names and marks were the company's primary products. *See* Trial Tr. vol. 3, 489, Sept. 21, 2011 ("Q. You started in 1973, and you testified the primary products were the blank paddles,

14

the wooden letters, the crests. And by that you meant the decals and wooden backings? A. Yes."). Abraham invested heavily in the development of those products, spending well over a million dollars throughout Paddle Tramps's existence on various kinds of equipment designed to carve those products. Abraham presented evidence that he rebuilt his entire business on two separate occasions, once in response to a fire and once a tornado, and that he would not have done so had he known the Greeks would enforce their rights. The fact that today Paddle Tramps has expanded to include principally non-infringing products does not negate the fact that Abraham invested heavily in the development of the infringing products throughout the life of his business.

The Court is satisfied that the facts and inferences do not point "so strongly and overwhelmingly in favor of" the Greek Organizations that a reasonable jury could not arrive at a contrary verdict. Accordingly, the Court DENIES the Greek Organizations' renewed motion for judgment as a matter of law and GRANTS Abraham's Motion for Judgment on the Verdict with respect to undue prejudice.

### c. Lack of Excuse for Delay in Bringing this Lawsuit

Third, the Greek Organizations argue that the jury did not have a legally sufficient evidentiary basis to find that there was no excuse for their delay in bringing about this litigation because Paddle Tramps's infringement was so minor for so long. Here too, the Greek Organizations focus not on the sufficiency of the evidence presented to the jury, but the jury charge. The jury was instructed as follows:

> Mr. Abraham must prove by a preponderance of the evidence that there was a lack of excuse for the Greek Organizations' delay.
> The Greek Organizations claim their delay is excused because Mr.

Abraham expanded his use of their marks in a way that brought him more squarely in competition with the Greek Organizations. This argument is based on a legal doctrine called progressive encroachment. Under the doctrine of progressive encroachment, the trademark owner's delay is excused where the unlicensed user begins to use the trademark in the market, and later modifies or intensifies its use of the trademark to the effect that the unlicensed user significantly impacts the trademark owner's good will and business reputation, so that the unlicensed user is placed more squarely in competition with the trademark owner. The mark owner need not sue until the harm from the unlicensed user's use of the mark looms large. It is therefore the significant increase in the scope of the unlicensed user's business, not reliance on the same general business model, that supports the doctrine of progressive encroachment.

The Greek Organizations also argue their delay was excused because they were pursuing lawsuits against other unlicensed users of the Greek Organizations' marks before bringing a lawsuit against Mr. Abraham. A trademark owner's delay in enforcing its rights against one unlicensed user may be excused if it chooses to initiate legal action against other unlicensed users whose use is more widespread, when the issues in these other lawsuits are relevant to the claim against the unlicensed user in the present suit. Please remember that the facts in the present lawsuit are unique to this case and therefore that the results in the other lawsuits are not controlling here.

Ct.'s Charge to the Jury, at 4. The Greeks argue that the jury should have been instructed that when the infringement in issue is "*de minimus*," it excuses delay because the extent of the infringement does not justify the cost of litigation. Defs.' Mot., at 16. The Greeks contend that had the jury been "properly" instructed, there would not be a legally sufficient evidentiary basis for the jury to find that the Greek Organizations lacked an excuse for their delay because Paddle Tramps's infringement was *de minimus*. The Greeks point to evidence introduced at trial that had Paddle Tramps taken licenses, each of the Greek Organizations engaged in the litigation would have made an average annual royalty of only $141.27.

Once again, the Greek Organizations timely made these arguments with respect to

the instructions at the charge conference and, to the extent that their proposals were rejected, can raise the matter on appeal. The Court notes that the Greek Organizations proposed the "looms large" instruction that they now attack, and the Court adopted it over Abraham's objection. The "looms large" language, however, does not refer exclusively to the monetary value of the infringement, but instead to the likelihood of public confusion based on the extent of the infringing use. *Johanna Farms, Inc. v. Citrus Bowl, Inc.*, 468 F. Supp. 866, 881 (D.C.N.Y. 1978) ("[U]ntil there exists an actual clash of interests or until the expansion of the owner's mark into the infringer's territory is on the verge of implementation so that the likelihood of public confusion looms large, there is no basis for an infringement suit."). Therefore, the Court finds that even had the Greek Organizations properly challenged the jury instructions on lack of excuse, they would not have met their burden of demonstrating that, as a whole, the instructions create "substantial doubt as to whether the jury was properly guided in its deliberations." *Green*, 284 F.3d at 659.

The question now before the Court is whether there was a legally sufficient evidentiary basis for a reasonable jury, as instructed, to find that the Greek Organizations' delay was not excused. The Court concludes that there was. The evidence introduced at trial showed that Paddle Tramps's products and operations have remained largely consistent since Abraham founded the company in the 1960s, that Paddle Tramps had established a national presence by 1990 by maintaining a prominent presence at Greek industry trade shows across the nation, employing traveling salesmen, and advertising its goods in a nationally distributed catalogue, and that Abraham started a

17

website to market Paddle Tramps products in 1997. The jury further heard evidence that in 1995, the Greek Organizations specifically threatened litigation against Abraham, revealing their own impression that the scope of his use of their marks was actionable at that time, but did not file suit against him until 2007. Therefore, the Court finds that the evidence does not weigh "so strongly and overwhelmingly in favor of" the Greek Organizations that a reasonable jury could not arrive at a contrary verdict. Accordingly, the Court DENIES the Greek Organizations' renewed motion for judgment as a matter of law and GRANTS Abraham's Motion for Judgment on the Verdict with respect to lack of excuse.

### d. Acquiescence

Finally, the Greek Organizations argue that the issue of acquiescence should not have been submitted to the jury at all. The Greeks contend that because each organization ultimately objected to Abraham's use of their marks, the only type of acquiescence that the jury could have found was implied acquiescence. Therefore, the Greeks object to the fact that express acquiescence was submitted to the jury. The Greek Organizations further object to the jury's finding of implied acquiescence because such a finding impacts only the amount of damages that may be awarded. *See Menendez v. Holt*, 128 U.S. 514, 528–29 (1888) (explaining that implicit acquiescence bars any claim for damages arising prior to the termination of the acquiescence). They argue that because the damages calculation was bifurcated from the instant case, implied acquiescence was not relevant to any of the issues before the jury.

The Court declines to entertain the Greek Organizations' Motion for Judgment as

18

a Matter of Law on this issue. It is well established that express or implied acquiescence can bar recovery for trademark infringement. *Conan Props.,* 752 F.2d at 152 ("The jury's affirmative finding of acquiescence establishes the reliance necessary to preclude the issuance of an injunction."). The Greek Organizations do not dispute that evidence that the Greek Organizations impliedly acquiesced in Abraham's use of the marks before they issued cease and desist letters was introduced at trial. Therefore, implied acquiescence was a properly asserted defense to infringement and the matter was properly submitted to the jury. Further, even if it should not have gone to the jury, by the Greeks' own admission, it could not have "affected the outcome of the case" such that reversal might be merited because of the jury's findings on laches, lack of excuse, and unclean hands. *Green,* 284 F.3d at 659. To put it another way, the jury's decision on acquiescence has no bearing on the outcome of this case in light of its other findings. Accordingly, the Court DENIES the Greek Organizations Motion for Judgment as a Matter of Law on this basis, and GRANTS Abraham's Motion for Judgment on the Verdict with respect to implied acquiescence.

For the aforementioned reasons, Abraham's Motion for Judgment on the Verdict is GRANTED and the Greek Organizations' Renewed Motion for Judgment as a Matter of Law is DENIED.

### B. Entry of a Permanent Injunction

The Greek Organizations also move for entry of an injunction permanently enjoining Abraham from using their marks in the future. Abraham contends the length of the Greek Organizations' delay merits denial of prospective injunctive relief in this case.

19

1. Legal Standard

"A finding of laches alone ordinarily will not bar the plaintiff's request for injunctive relief, although it typically will foreclose a demand for an accounting or damages." *Conans Prop.*, 752 F.2d at 152 (citing *Menendez v. Holt*, 128 U.S. 514, 524 (1888)). However, "[t]here is a narrow class of cases where the plaintiff's delay has been so outrageous, unreasonable and inexcusable as to constitute a virtual abandonment of its right." *Univ. of Pittsburgh v. Champion Prod., Inc.*, 686 F.2d 1040, 1044 (3rd Cir. 1982). In order to determine whether a permanent injunction should issue after a successful laches defense, courts consistently focus on the degree of prejudice the defendant would suffer in the event the infringing use is enjoined. *See, e.g., Conans Prop.*, 752 F.2d at 153 (declining to impose a permanent injunction where the defendant had invested heavily in the infringing use during the plaintiff's delay, but imposing a permanent injunction where enjoining the use would only minimally prejudice the defendant); *Champion Prod.*, 686 F.2d at 1048–49 (reversing a denial of a permanent injunction where the evidence suggested the degree of prejudice a permanent injunction would impose on the defendant was minimal); *Birney*, 2000 WL 33538621, at *9, *11 (declining to permanently enjoin the infringing use where the defendant had invested heavily in the infringing use during the defendant's delay).

In *Conans Properties*, the plaintiff owned rights to the "Conan the Barbarian" comic books, and the defendant operated restaurants called "Conans Pizza" that employed the comic icon as a theme. *Conans Prop.*, 752 F.2d at 147–48. The defendant opened five "Conans Pizza" restaurants in Austin between 1976 and 1980, and one in San

Antonio in 1982. *Id.* at 148. In 1981, the mark owner sent the defendant a cease and desist letter and filed suit the following year, just after the defendant opened the San Antonio branch. *Id.* The jury found infringement, but declined to award damages because the defendant successfully argued laches and acquiescence. *Id.* at 149. The plaintiff moved for injunctive relief after trial, and the district court denied the motion. *Id.*

On appeal, the Fifth Circuit was charged with determining whether the district court properly denied prospective injunctive relief. The *Conans* court upheld the district court's denial of injunctive relief with respect to restaurants the defendant opened in Austin because the plaintiff had "unreasonably delayed in protecting its rights in Austin, and its dilatoriness prejudiced Conans." *Id.* at 152. However, the court also found that the plaintiff's delay did not preclude a permanent prospective injunction prohibiting the defendant's use of the mark outside of Austin, because the defendant had invested little in the new San Antonio location, and any prejudice a permanent injunction would impose would be minimal. *Id.* at 153. The key inquiry in *Conan's* was the degree of prejudice the defendant suffered during the mark owner's delay:

> An injunction against future infringement in a particular locale when laches and acquiescence have been found, as in this case, is properly denied if the plaintiff's delay or other conduct either induced reliance on the defendant's part or will result in substantial prejudice to the defendant if the plaintiff is permitted to enforce its rights in the trademark . . . The result is different, however, when the asserted future infringement would occur in a geographical area other than the one in which the plaintiff waived its right to protect its mark. In the new geographical area where the defendant has not yet expanded its business, the defendant is hard pressed to demonstrate how it could have relied to its detriment upon the plaintiff's inactivity or other conduct.

*Id.*

In *H.G. Shopping Centers, L.P. v. Birney*, the court determined a permanent injunction was not an appropriate remedy in light of the length of the plaintiff's delay. *Birney*, 2000 WL 33538621, at *11. The plaintiff in *Birney* sought to enforce his trademark rights to the name "The Galleria," a popular Houston commercial development, against nearby condominiums called the "Galleria Oaks." *Id.* at *1. Shortly after the Galleria Oaks opened in 1978, the mark owner sent a letter objecting to the residential development's use of the "Galleria" name. *Id.* This was the first in a series of letters that the plaintiff sent to the Galleria Oaks for over twenty years protesting the use of the name. *Id.* at *1–2. When the plaintiff finally filed suit against Galleria Oaks in 1999, the defendant asserted a laches defense. *Id.* at *4. The Court granted summary judgment in favor of the defendant, determining that no permanent injunction should issue because the defendants had invested in "advertising and property maintenance through the years in addition to the recent multimillion dollar renovation," and had not "expanded or intensified their use of the 'Galleria' name after notice of Plaintiff's objections." *Id.* at *9, *11.

In *University of Pittsburgh v. Champion Products*, the court was charged with determining whether laches barred a permanent injunction where the infringement involved the sale of exact replicas of the protected marks. The court adopted a test balancing the length of the mark owner's delay against the degree of prejudice the defendant would suffer if the unlicensed use was permanently enjoined. *See id.* at 1046

(rejecting "Champion's contention that Pitt's delay alone has barred its right to prospective relief and hold[ing] that such a bar must depend upon the degree to which Pitt's delay may have prejudiced Champion"). The defendant had created the market for soft goods sporting the plaintiff's marks and enjoyed use of the marks for over forty years before the plaintiff filed suit. However, by the time the University of Pittsburgh filed suit, the defendant used the marks of over 10,000 other schools on its soft goods and had only invested in Pitt's marks to the extent that it had purchased disposable screens to print the designs. *Id.* at 1048–49.

The Third Circuit reversed the district court's finding that the defendant's successful laches defense barred permanent injunctive relief and remanded the matter for further consideration because the evidence suggested that the prejudice a permanent injunction would have imposed on the defendant was minimal. In reaching its conclusion, the court cited language from the Fifth Circuit's *Boston Hockey* decision, in which the court found that "only a prohibition of the unauthorized use will sufficiently remedy the wrong" where the defendant was engaged in the sale of exact replicas of the plaintiff's marks. *Id.* at 1049 (citing *Boston Pro Hockey*, 510 F.2d at 1013). While the defendant in *Boston Hockey* did not assert laches or acquiescence defenses, the Third Circuit's citation in the context of a successful laches defense does suggest that where the infringing user employs exact replicas of the plaintiff's marks, a thumb is placed on the permanent injunction side of the scale. In all three of the above-discussed cases, the courts' primary inquiry in determining whether to issue a permanent injunction against the infringing use notwithstanding a successful defense was the degree of prejudice such

23

an injunction would impose on the defendant.

## 2. Application

The Greek Organizations do not dispute that they did not file suit to enforce their marks until forty years after Paddle Tramps began using them in its products. Nevertheless, they petition the Court to permanently enjoin two of Paddle Tramps's infringing practices notwithstanding the jury's findings of laches and acquiescence: (1) the use of the Greek Organizations' names and insignia in Paddle Tramps's advertising, including Internet advertising, and (2) sales of wood-carved replicas of the Greek Organizations' full names and crests, and wood backings carved in the outline of the Greeks' crests (the "double-raised crests"). In order to determine whether the injunction should issue, the Court balances the equities, weighing the degree of prejudice Abraham would suffer if either use was permanently enjoined against the Greeks' right to exclusive use of the marks and the public interest in avoiding consumer confusion caused by their continued use.

### a. Advertising

The Court is of the opinion that any prejudice Abraham would suffer as a result of a permanent injunction against future use of the Greeks' marks for advertising purposes is insufficient to bar injunctive relief. In his initial response to the Greeks' Motion for a Permanent Injunction, Abraham introduced little-to-no evidence that being enjoined from using the Greeks' marks in Paddle Tramps's advertising would prejudice him. As the Greeks point out, Abraham can advertise his products without perpetuating the infringement by replacing the trademarked images in Paddle Tramps catalogues and on

the company's sample products and website with the names and images of any of the Greek Organizations that do not sponsor licensing programs, or by using a made-up name and crest.  In his supplemental brief, Abraham argues that not being able to use the Greeks' marks in advertising would dramatically impact the company's business because potential customers would be deterred by not seeing their organizations' marks on sample Paddle Tramps products.  Abraham suggests it could alleviate potential consumer confusion by placing "conspicuously displayed affirmative disclaimers on the crest and paddle kit pages of Paddle Tramps's website, on order forms, catalogs or brochures, in trade show booths, and on the packaging of the double raised, mini and engraved crests in its inventory and in its retail store." Pl.'s Supplemental Br. 1 (Doc. No. 151).  Abraham further contends that having to replace existing samples bearing the marks would cost Paddle Tramps tens of thousands of dollars.

The Court does not find Paddle Tramps arguments persuasive.  Paddle Tramps's products are marketed to the members of Greek Organizations who understand that their fraternity or sorority is one of any number of organizations nation-wide.  This is a sophisticated audience that can easily envision a customized product based on examples bearing the marks of a mythical Greek organization or one that does not have a licensing program.  Even if the use of non-infringing examples in advertising is not the *best* marketing technique, Abraham has not produced sufficient evidence to show that being enjoined from using the Greeks' marks on its sample products would cause sufficient prejudice to avoid injunctive relief.

With respect to Abraham's proposed use of a disclaimer, the Court is of the

opinion that this is not the type of case in which a disclaimer will effectively balance the equities.   In those cases where the Fifth Circuit has ordered the use of disclaimers, additional factors, not present here, have weighed in favor of the unlicensed users' continued use of the marks.   For example, in *Westchester Media v. PRL USA Holdings, Inc.*, the court found disclaimers were an appropriate method of balancing the equities when the defendant's First Amendment rights were at stake: "Where the allegedly infringing speech is at least partly literary or artistic, however, and not solely a commercial appropriation of another's mark, the preferred course is to accommodate trademark remedies with First Amendment interests.   . . . One obvious mode of accommodation is a disclaimer."   *Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 672 (5th Cir. 2000).   In *Pebble Beach Co. v. Tour 18 I, Ltd.*, the Defendant, the owner of a golf course, modeled certain holes after signature holes at famous golf courses.   *Pebble Beach Co. v. Tour 18 I, Ltd.*, 155 F.3d 526, 533 (5th Cir. 1998).   The court permitted the use of statements disclaiming any endorsement, sponsorship, or affiliation with the famous golf courses only after determining that the Defendant's use of the marks to identify these courses was nominative, placing it "outside the strictures of trademark law." *Id.*, at 552. Where no additional factors weigh in favor of the unlicensed user's continued use of the marks and the unlicensed marks are exact replicas of the mark owner's marks, the Fifth Circuit has found that the "unfair competition cannot . . . be rendered fair by [] disclaimer." *Boston Pro Hockey*, 510 F.2d 1004, 1013.

Paddle Tramps attempts to distinguish *Boston Pro Hockey* on the ground that in that case the Defendant did not plead laches.  However, this does not impact the Court's

analysis, which focuses on whether a permanent injunction should issue *notwithstanding*
Abraham's success in avoiding money damages by way of his laches defense.  Because
no additional factors weigh in favor of Abraham's continued, unlicensed use of the
Greeks' marks in advertising and because the images are exact replicas of the Greeks'
names and marks, this case is more closely aligned with *Boston Pro Hockey* than the
above-described cases where the use of disclaimers effectively balanced the equities.[2]

Finally, the Greeks make clear in their supplemental response that they are not
asking Paddle Tramps to recall those samples it has already issued; they ask only that the
company not create or provide samples bearing their marks in the future.  Therefore,
Abraham will not have to spend any money recalling and replacing existing samples in
order to comply with the injunction.

For these reasons, the Court finds that Abraham has not shown that the prejudice
he would incur if permanently enjoined from using the Greeks' names and marks in
Paddle Tramps's advertising is significant enough to bar injunctive relief,
notwithstanding the Greek Organizations' initial delay in enforcing their rights.
Accordingly, Abraham is PERMANENTLY ENJOINED from using the Greeks' names
or marks in any Paddle Tramps advertising, in print or online, with the following narrow
exception: the Fifth Circuit has made clear that "it is not a violation of trademark law to

---

[2] In their supplemental briefing, the parties spend a great deal of time debating whether
"initial interest confusion," or the legal concept of luring customers into the unlicensed
user's shop with infringing activity, should impact this Court's analysis of the use of
disclaimers in this case.  Because the Court finds that disclaimers will not effectively
balance the equities regardless of initial interest confusion, it need not consider these
arguments.

sell another mark owner's genuine goods unless the manner in which the defendant sells those genuine goods improperly suggests endorsement by, sponsorship by, or affiliation with the mark owner." *Mary Kay, Inc. v. Weber*, 661 F.Supp.2d 632, 645 (N.D. Tex. 2009). Because Paddle Tramps markets licensed decals in addition to its infringing products, it is permitted to label those particular licensed products on its website and in its promotional materials with the names of the Greek Organizations that they represent; *e.g.* "Alpha Chi Omega Decal."

### b. Products

The Court is of the opinion that the prejudice Abraham would suffer as a result of a permanent injunction against future use of the Greeks' marks on Paddle Tramps's products weighs in favor of barring permanent injunctive relief with respect to the double-raised crest backing, but not the full names of the organizations or the wood-carved replicas of their crests. At trial, Abraham testified that he created the market for the type of products Paddle Tramps sells and built up a business around them. He explained that throughout the life of his business he invested between $1,250,000 and $1,750,000 in wood-carving equipment. As noted above, when Paddle Tramps started out, this equipment was used primarily to create the infringing products, namely the Greeks' insignia, crests, and backing in the outline of the crest that off-sets the crest from the face of the paddle in an aesthetically pleasing way (the "double-raised crest"). As Paddle Tramps grew, the equipment began to be used for additional, non-infringing uses. However, Abraham and his co-workers introduced evidence at trial that the "double-raised crest" drives sales of Paddle Tramps's products. By the time the Greeks sent their

first cease and desist letter in 1990, Abraham had been using his signature double-raised crest for close to thirty years. Abraham and his employees testified that Paddle Tramps's business would be devastated if it was enjoined from selling this unique feature.

The Greek Organizations contend that any prejudice Abraham would endure if permanently enjoined from selling products sporting their marks is minimal because they account for only 2.44% of Paddle Tramps's total sales. The Greeks further argue that Abraham's infringing sales should be enjoined because Paddle Tramps products employ exact replicas of the marks; Abraham's facilities and equipment can be used to make non-infringing products; and Abraham received warning letters advising him of the Greeks' objection to his use of their marks for seventeen years before they filed suit, and therefore Abraham has invested in Paddle Tramps at his own risk since 1990.

With respect to the full names of the Greek Organizations and the wood-carved replicas of their crests, the Court agrees with the Greek Organizations that the equities weigh in favor of a permanent injunction. Since Paddle Tramps transitioned to a wholesale business model where individual Greek letters make up the majority of its sales, and since it started selling the licensed decals in addition to the wood-carved crests, these items are far less popular with customers than they have been in the past. Further, these products are exact replicas of the Greeks' marks, which adds a thumb on the scale in favor of the Greeks.

However, with respect to the wood backing for the double-raised crests, the Court is of the opinion that the Greeks' arguments ignore the extent of Abraham's investment in the creation and sale of these products, which developed for over forty years while the

Greek Organizations delayed in filing suit, and the extent to which these unique features benefit the sale of Paddle Tramps's other products.  The degree of potential prejudice here is comparable to that which the defendants in *Conan's Pizza* and *Birney* would have faced had they been completely denied use of the plaintiffs' marks after investing in their businesses for the duration of the plaintiffs' delay.  Further, as in *Birney*, the long period over which the Greek Organizations sent letters threatening litigation only re-enforced the impression that they would not take legal action to protect their marks.  *Birney*, 2000 WL 33538621, at *9.  Therefore, the Court finds that Abraham has shown that the prejudice he would suffer if permanently enjoined from using the double-raised crests is sufficiently significant to bar permanent injunctive relief.  Accordingly, the Greek Organizations' Motion for Entry of a Permanent Injunction is GRANTED with respect to Abraham's sale and use of the full names of the Greek Organizations and the wood-carved replicas of the Greeks' marks and DENIED with respect to Abraham's sale and use of the double-raised crest backing in Paddle Tramps products.

For the aforementioned reasons, the Greek Organizations' Motion for Entry of a Permanent Injunction is GRANTED to the extent that Abraham is PERMANENTLY ENJOINED from using the Greek Organizations' names and marks in his catalogues, on his website, or in any other advertising materials, with the limited exception of labeling the licensed decals with the name of the corresponding Greek Organization; and PERMANENTLY ENJOINED from making or selling the full names of the Greek Organizations or wood-carved replicas of the Greek's crests. The Greek Organizations' Motion is DENIED to the extent that Abraham's sale of the double-raised crest backing

in the outline of the Greeks' crests is not enjoined.

The Court provides the following guidance to Paddle Tramps to enable it to offer the double-raised crests of the Greek Organizations without using the Greeks' names in its advertising or order forms: The infringing and unlicensed yet permitted double-raised backing for the licensed decals may be identified in Paddle Tramps's marketing materials only by generic language such as "crest backing." Where the customer wants to place an order for the double-raised backing for a specific crest, the customer must write or type the name of the organization in a field designated for that purpose on the order form, or select the licensed decal properly labeled with the name of the organization and indicate he or she also wants the crest backing that corresponds to that organizations' decal.

### C. Costs

Finally, Abraham moves for an award of costs of court. Rule 54(d)(1) of the Federal Rules of Civil Procedure provides that the prevailing party is entitled to recover costs of court. Fed. R. Civ. P. 54(d)(1). The Greek Organizations argue that costs should not be awarded unless only one party prevails on all matters at issue. The Court agrees. Because the Greek Organizations received summary judgment of infringement in their favor and a partial permanent injunction against Abraham's future use of their marks, each party will bear his own costs. Accordingly, Abraham's request for an award for costs of court is DENIED.

### III. Conclusion

For the aforementioned reasons, the Court rules as follows:

1)      Abraham's Motion for Judgment on the Verdict is GRANTED;

31

2)    The Greek Organizations' Cross-Motion for Judgment as a Matter of Law is DENIED;

3)    The Greek Organizations' Motion for Entry of a Permanent Injunction is GRANTED to the extent that Abraham is permanently enjoined from using the Greeks' names and marks in his catalogues, on his website, or in any other advertising materials, with the limited exception of using the organization's name to identify the licensed decals; and permanently enjoined from making or selling the full names of the Greek Organizations or the wood-carved replicas of the Greeks' crests. The Motion is DENIED to the extent that Abraham's creation and sale of the wood-carved backing in the outline of the Greeks' crest is not enjoined; and

4)    Abraham's Motion for Costs of Court is DENIED.


IT IS SO ORDERED.

Signed this 7th day of May, 2012.

_Royal Furgeson_
Royal Furgeson
United States Senior District Judge